UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
------------------------------------------------------------X
NELLA REBELLO as Administrator of the Estate )
of ANDREA REBELLO, NELLA REBELLO, )
individually, FERNANDO REBELLO and )
JESSICA REBELLO, )
 

              Plaintiff,

      -against-

POLICE OFFICER NIKOLAS BUDIMLIC,
POLICE OFFICER NICHOLAS ZAHARIS,
COUNTY OF NASSAU, DETECTIVE MARTIN
J. HELMKE, POLICE OFFICER JOSEPH
AVANZATO, POLICE OFFICER MICHAEL
LEONE, POLICE  OFFICER MARLON
SANDERS, POLICE  OFFICER JOSEPH
LOBELLO, POLICE  OFFICER CHRISTOPHER
ACQUILINO,  POLICE OFFICER RAYMOND
BUTTACAVOLI, POLICE OFFICER DANIEL
HEALEY, POLICE OFFICER DENNIS
WUNSCH, POLICE OFFICER RONALD
RUSSO, POLICE OFFICER D. STELLER,
POLICE OFFICER THOMAS CURTAIN,
POLICE OFFICER JOHN TUCKER, POLICE
SERGEANT ROBERT COHEN, POLICE
SERGEANT RICHARD HERMAN, POLICE
OFFICER J. SCHOEPFER, POLICE OFFICER
E. JACOBSEN, POLICE OFFICER D.
MCGARRIGLE, THOMAS DALE, former
Commissioner of the Nassau County Police
Department, DETECTIVE FREDERICK
GOLDMAN, DETECTIVE FRANK RUVULO,
DETECTIVE JAMES HENDRY, DETECTIVE
PAUL PICH, DETECTIVE MICHAEL
MALONEY, DETECTIVE BUFFALINO,
DETECTIVE SERGEANT AQUILINA, LT. JOHN
AZZATA, CHIEF LORRAINE HANNON,  Chief
Of Support, DEPUTY INSPECTOR  JOSEPH
MAGRANE, Commanding Officer, 1st  Precinct,
DEPUTY INSPECTOR DANIEL FLANAGAN,

**COMPLAINT**

**JURY TRIAL DEMANDED**

Commanding Officer, Police Academy,                )
LIEUTENANT HARUN BEGIS, Commanding          )
Officer, Firearms Training Unit, DETECTIVE       )
SERGEANT STEPHEN FITZPATRICK,                )
Homicide Squad, JOHN DOE POLICE OFFICERS )
1-10; RICHARD ROE POLICE SUPERVISORS       )
1-10; JOHN DOES; and RICHARD ROES,               )
                                                                         )
                                   Defendants.                  )

---------------------------------------------------------X

## PRELIMINARY STATEMENT

1.    This is a civil action in which the plaintiffs seek relief for the defendants' violation of their rights secured by the Civil Rights Act of 1871, 42 U.S.C. § 1983, and by the United States Constitution, including its Fourth and Fourteenth Amendments.  The plaintiffs seek damages, both compensatory and punitive, affirmative and equitable relief, an award of costs and attorneys' fees, and such other and further relief as this court deems equitable and just.

## JURISDICTION

2.    This action is brought pursuant to the Constitution of the United States, including its Fourth and Fourteenth Amendments, and pursuant to 42 U.S.C. § 1983.  Jurisdiction is conferred upon this court by 42 U.S.C. § 1983 and 28 U.S.C. §§1331 and 1343(a)(3) and (4), this being an action seeking redress for the violation of the plaintiffs' constitutional and civil rights.

## JURY TRIAL DEMANDED

4.   Plaintiffs demand a trial by jury on each and every one of his claims as pleaded herein.

## VENUE

5.   Venue is proper for the United States District Court for the Eastern District of New York pursuant to 28 U.S.C. §1391 (a), (b) and (c).

## PARTIES

6.   Plaintiffs were at all times relevant herein residents of the State of New York, County of Westchester.

7.   Defendant COUNTY OF NASSAU is and was at all times relevant herein a municipal entity created and authorized under the laws of the State of New York.  It is authorized by law to maintain a police department, which acts as its agent in the area of law enforcement and for which it is ultimately responsible. Defendant COUNTY OF NASSAU (COUNTY) assumes the risks incidental to the maintenance of a police force and the employment of police officers as said risk attaches to the public consumers of the services provided by the Nassau County Police Department.

8.   At all times mentioned herein, defendant, Former Police Commissioner, THOMAS DALE (DALE), was employed by defendant, COUNTY, as the highest ranking police officer and Commissioner of the Nassau County Police Department.

9.   At all times mentioned herein, defendant, DALE, was acting

within the scope of his employment  as the Commissioner of the Nassau County Police Department.

10.  At all times mentioned herein, defendant, DALE, was in his official capacity acting under color of law and authority as a police officer with the Nassau County Police Department.

11.  At all times mentioned herein, defendant, DALE, as Commissioner of the Nassau County Police Department, had supervisory duties over all Nassau County Police officers, supervisors, Police Communications Operators and Police Communications Operators Supervisors as well as other police personnel.

12.  At all times mentioned herein, defendant, DALE, was acting in both his individual and his official capacities.

13.  DALE is sued herein in both his individual and official capacities.

14.  Defendants POLICE OFFICER NIKOLAS BUDIMLIC, POLICE OFFICER NICHOLAS ZAHARIS, DETECTIVE MARTIN J. HELMKE, JOHN DOE NASSAU COUNTY, POLICE OFFICER JOSEPH AVANZATO, POLICE OFFICER MICHAEL LEONE, POLICE OFFICER MARLON SANDERS, POLICE OFFICER JOSEPH LOBELLO, POLICE OFFICER CHRISTOPHER ACQUILINO, POLICE OFFICER RAYMOND BUTTACAVOLI, POLICE OFFICER DANIEL HEALEY, POLICE OFFICER DENNIS WUNSCH, POLICE OFFICER RONALD RUSSO, POLICE OFFICER D. STELLER, POLICE OFFICER THOMAS CURTAIN, POLICE OFFICER JOHN TUCKER, POLICE SERGEANT ROBERT COHEN, POLICE SERGEANT RICHARD HERMAN, POLICE OFFICER J. SCHOEPFER, POLICE OFFICER E.

JACOBSEN, POLICE OFFICER D. MCGARRIGLE, DETECTIVE FREDERICK
GOLDMAN, DETECTIVE FRANK A RUVULO, DETECTIVE JAMES HENDRY,
DETECTIVE PAUL PICH, DETECTIVE MICHAEL MALONEY, DETECTIVE
BUFFALINO, DETECTIVE SERGENT AQUILINA, LT. JOHN AZZATA, CHIEF
LORRAINE A. HANNON, Chief Of Support, DEPUTY INSPECTOR JOSEPH
MAGRANE, Commanding Officer, 1st Precinct, DEPUTY INSPECTOR
DANIEL FLANAGAN, Commanding Officer, Police Academy, LIEUTENANT
HARUN BEGIS, Commanding Officer, Firearms Training Unit,
DETECTIVE SERGEANT STEPHEN FITZPATRICK, Homicide Squad, JOHN DOE
POLICE OFFICERS 1-10, and JOHN DOES are and were at all times
relevant herein duly appointed and acting officers, servants,
employees and agents of the COUNTY OF NASSAU and/or the Nassau
County Police Department (NCPD), a municipal agency of defendant
COUNTY OF NASSAU. Defendants POLICE OFFICER NIKOLAS BUDIMLIC,
POLICE OFFICER NICHOLAS ZAHARIS, DETECTIVE MARTIN J. HELMKE, JOHN
DOE NASSAU COUNTY, POLICE OFFICER JOSEPH AVANZATO, POLICE OFFICER
MICHAEL LEONE, POLICE OFFICER MARLON SANDERS, POLICE OFFICER
JOSEPH LOBELLO, POLICE OFFICER CHRISTOPHER ACQUILINO, POLICE
OFFICER RAYMOND BUTTACAVOLI, POLICE OFFICER DANIEL HEALEY, POLICE
OFFICER DENNIS WUNSCH, POLICE OFFICER RONALD RUSSO, POLICE
OFFICER D. STELLER, POLICE OFFICER THOMAS CURTAIN, POLICE OFFICER
JOHN TUCKER, POLICE SERGEANT ROBERT COHEN, POLICE SERGEANT
RICHARD HERMAN, POLICE OFFICER J. SCHOEPFER, POLICE OFFICER E.
JACOBSEN, POLICE OFFICER D. MCGARRIGLE, DETECTIVE FREDERICK

GOLDMAN, DETECTIVE FRANK A RUVULO, DETECTIVE JAMES HENDRY,
DETECTIVE PAUL PICH, DETECTIVE MICHAEL MALONEY, DETECTIVE
BUFFALINO, DETECTIVE SERGENT AQUILINA, LT. JOHN AZZATA, CHIEF
LORRAINE A. HANNON, Chief Of Support, DEPUTY INSPECTOR JOSEPH
MAGRANE, Commanding Officer, 1st Precinct, DEPUTY INSPECTOR
DANIEL FLANAGAN, Commanding Officer, Police Academy, LIEUTENANT
HARUN BEGIS, Commanding Officer, Firearms Training Unit,
DETECTIVE SERGEANT STEPHEN FITZPATRICK, Homicide Squad, JOHN DOE
POLICE OFFICERS 1-10, and JOHN DOES are and were at all times
relevant herein acting under color of state law in the course and
scope of their duties and functions as officers, agents,
servants, and employees of defendant COUNTY OF NASSAU, were
acting for, and on behalf of, and with the power and authority
vested in them by COUNTY OF NASSAU and the Nassau County Police
Department, and were otherwise performing and engaging in conduct
incidental to the performance of their lawful functions in the
course of their duties. POLICE OFFICER NIKOLAS BUDIMLIC, POLICE
OFFICER NICHOLAS ZAHARIS, DETECTIVE MARTIN J. HELMKE, JOHN DOE
NASSAU COUNTY, POLICE OFFICER JOSEPH AVANZATO, POLICE OFFICER
MICHAEL LEONE, POLICE OFFICER MARLON SANDERS, POLICE OFFICER
JOSEPH LOBELLO, POLICE OFFICER CHRISTOPHER ACQUILINO, POLICE
OFFICER RAYMOND BUTTACAVOLI, POLICE OFFICER DANIEL HEALEY, POLICE
OFFICER DENNIS WUNSCH, POLICE OFFICER RONALD RUSSO, POLICE
OFFICER D. STELLER, POLICE OFFICER THOMAS CURTAIN, POLICE OFFICER

JOHN TUCKER, POLICE SERGEANT ROBERT COHEN, POLICE SERGEANT
RICHARD HERMAN, POLICE OFFICER J. SCHOEPFER, POLICE OFFICER E.
JACOBSEN, POLICE OFFICER D. MCGARRIGLE, DETECTIVE FREDERICK
GOLDMAN, DETECTIVE FRANK A RUVULO, DETECTIVE JAMES HENDRY,
DETECTIVE PAUL PICH, DETECTIVE MICHAEL MALONEY, DETECTIVE
BUFFALINO, DETECTIVE SERGENT AQUILINA, LT. JOHN AZZATA, CHIEF
LORRAINE A. HANNON, Chief Of Support, DEPUTY INSPECTOR JOSEPH
MAGRANE, Commanding Officer, 1st Precinct,  DEPUTY INSPECTOR
DANIEL FLANAGAN, Commanding Officer, Police Academy, LIEUTENANT
HARUN BEGIS, Commanding Officer, Firearms Training Unit,
DETECTIVE SERGEANT STEPHEN FITZPATRICK, Homicide Squad, JOHN DOE
POLICE OFFICERS 1-10, and JOHN DOES are sued individually.

15.  Defendants LT. JOHN AZZATA, POLICE SERGEANT ROBERT
COHEN, POLICE SERGEANT RICHARD HERMAN, DETECTIVE SERGENT
AQUILINA, CHIEF LORRAINE A. HANNON, Chief Of Support, DEPUTY
INSPECTOR JOSEPH MAGRANE, Commanding Officer, 1st Precinct,
DEPUTY INSPECTOR DANIEL FLANAGAN, Commanding Officer, Police
Academy, LIEUTENANT HARUN BEGIS, Commanding Officer, Firearms
Training Unit, DETECTIVE SERGEANT STEPHEN FITZPATRICK, Homicide
Squad, Former Commissioner THOMAS DALE, RICHARD ROES 1-10 and
RICHARD ROES are and were at all times relevant herein duly
appointed and acting supervisory officers, servants, employees
and agents of the COUNTY OF NASSAU and/or the Nassau County
Police Department, responsible for the training, retention,

supervision, discipline and control of subordinate members of the police department under their command.  Defendants LT. JOHN AZZATA, POLICE SERGEANT ROBERT COHEN, POLICE SERGEANT RICHARD HERMAN, DETECTIVE SERGENT AQUILINA, CHIEF LORRAINE A. HANNON, Chief Of Support, DEPUTY INSPECTOR JOSEPH MAGRANE, Commanding Officer, 1st Precinct, DEPUTY INSPECTOR DANIEL FLANAGAN, Commanding Officer, Police Academy, LIEUTENANT HARUN BEGIS, Commanding Officer, Firearms Training Unit, DETECTIVE SERGEANT STEPHEN FITZPATRICK, Homicide Squad, Former Commissioner THOMAS DALE, RICHARD ROES 1-10 and RICHARD ROES are and were at all times relevant herein acting under color of state law in the course and scope of their duties and functions as supervisory officers, agents, servants, and employees of defendant COUNTY OF NASSAU, were acting for, and on behalf of, and with the power and authority vested in them by COUNTY OF NASSAU and the Nassau County Police Department, and were otherwise performing and engaging in conduct incidental to the performance of their lawful functions in the course of their duties.  Defendants LT. JOHN AZZATA, POLICE SERGEANT ROBERT COHEN, POLICE SERGEANT RICHARD HERMAN, DETECTIVE SERGENT AQUILINA, CHIEF LORRAINE A. HANNON, Chief Of Support, DEPUTY INSPECTOR JOSEPH MAGRANE, Commanding Officer, 1st Precinct, DEPUTY INSPECTOR DANIEL FLANAGAN, Commanding Officer, Police Academy, LIEUTENANT HARUN BEGIS, Commanding Officer, Firearms Training Unit, DETECTIVE SERGEANT

8

STEPHEN FITZPATRICK, Homicide Squad, Former Commissioner THOMAS DALE, RICHARD ROES 1-10 and RICHARD ROES are sued individually.

## STATEMENT OF FACTS[1]

16.   All of the facts stated herein are upon information and belief, except as to those attributed to Jessica Rebello.

17.   In 2004, the NYS 911 Board promulgated 21 NYCRR Part 5201, titled: Minimum Standards Regarding Call-Takers/Dispatchers Training. These standards applied to the Police Communication Officers (call-takers/dispatchers) employed by the County of Nassau to answer telephone calls and/or dispatch emergency services at the Public Safety answering point designated by Nassau County.

18.   Pursuant to 21 NYCRR Part 5201.4, the County of Nassau was required as of January 1, 2004, to have all Police Communication Officers (call-takers/dispatchers) receive a minimum of 21 hours of in-service training per year.

19.   In 2006, call-takers/dispatchers who were in a supervisory position were also required to complete an in-service

---

1. The within complaint cites to various documents outside of the complaint, most of which were obtained from defendant County as well as the Nassau County District Attorney's Office via numerous Freedom of Information Law (FOIL) responses, as well as documents obtained from the County and its Medical Examiner's Office as a result of pre-action motion practice. Additionally, articles and other complaints are referenced as well. Plaintiffs herein cite to these documents for their existence and the access to same by some or all of the Defendants, but not for the veracity or reliability of the conclusion contained therein.  These documents are referenced as the source of certain statements referenced herein, and claims that the County, its Police Department, and officers involved have made regarding the facts herein or the knowledge that the Defendants herein had or should have had when conducting their investigation. Upon information and belief much of this information is inaccurate, incomplete, self-serving, and written to perpetrate a cover up of the true facts and to protect the County and its officer's from liability.

training program within a 12 month period from the date of appointment to a supervisory position. In 2010, the New York State Division of Homeland Security and Emergency Services replaced the New York 911 Board with the Office of Interoperable and Emergency Communications responsible to enforce the standards passed by the 911 Board.

20.   The in-service training program for the call-takers/dispatchers and their supervisors included a focus on issues concerning how to handle emergency situations including hostage situations

21.   In 2008 Nassau County was designated by the state Department of Homeland security and emergency services as a public safety answering point – an advance 911 center that can receive emergency calls from wireless phones.

22.   To earn that designation and the millions in funding that goes with it the 911 operators must get a minimum of 21 hours of in-service classroom training, including how to handle hostage situations.

23.   The state allocated $3.4 million to Nassau County between 2008 and 2012 through the "local enhanced wireless 911 program," which reimburses County governments for communication costs relating to dispatch wireless 911 calls. A portion of these monies was to be slated for police communication operator training.

24.  Said monies were never provided for said training, however, and were used for purposes other than what was required by the department of Homeland Security.

25.  The Police Communication Oper3ars (call-takers/dispatchers) did not receive the required training through 2010.  The union for the Police Communication Officers (call-takers/dispatchers) in 2010 notified the Nassau County Police Department (hereinafter "NCPD") that there were in-service training requirements that the Police Communication Operators (call-takers/dispatchers) were not receiving.

26.  In 2011 the union for the Police Communication Operators (call-takers/dispatchers) had meetings with the Nassau County Police Department and on August 15, 2011 the Nassau County Police Department finally issued a Command Notification 11-024, stating that all Police Communication Operators (call takers/dispatchers) would receive the mandatory in-service training starting on September 26, 2011.  At the time of this Command Notification, Thomas V. Dale was the Nassau County Police Commissioner.

27.  On September 16, 2011 the Nassau County Police Department issued a subsequent Command Notification 11-027, which cancelled the previous Command Notification 11-024, which had scheduled the required in-service training. The memo contained no explanation for the cancellation.

28.  On May 3, 2013, just 2 weeks before ANDREA REBELLO was shot and killed, the Union for the Police Communication Operators (PCOs) made a further demand to Nassau County to comply with the mandated in-service training requirements.

29.  In June of 2013 the police communications operators union filed a petition stating that they still had not received the mandatory training, which included training in hostage situations.

30.  Then, in June 2014, the police communications operators union filed suit for the same relief.

31.  The Police Communication Operators (call-takers/dispatchers) and their supervisors never received the mandated in-service training, which included training for hostage situations, between 2008 and the date of the shooting of ANDREA REBELLO on May 17, 2013.

32.  Had the police communications operators been properly trained they would have been able to give better information to the Police Officers and Supervisors in the field who in turn would have implemented better and more appropriate procedures for addressing hostage situations.

33.  Had the police communications operators been properly trained they would have pressed the standard operating procedure (SOP) button which would have provided them with more directions and information which would have enabled the PCOs to alert the

police officers and their supervisors that there was a hostage situation.

34.  The police communication operators were not properly trained and therefore did not access or disseminate to the officers in the field, and the defendants herein, the standard operating procedure for hostage situations.

35.  The 911 operators use a computer system which has a standard operating procedure button, that gives a drop down menu on their computer screen providing the 911 operators with information regarding procedures that should be followed for that particular call. The police communication operators were unable to identify and accurately access the applicable information so that they could provide specific information to the police officers.

36.  Following the shooting, there were multiple articles published in the press, which cited to and quoted from unidentified police sources and from the police union president that stated that officer BUDIMLIC did not know he was going into a hostage situation when he went into the house where the shooting occurred.

37.  The likely purpose of these leaks and statements to the press that the officer did not know it was a hostage situation was to deflect responsibility from officer BUDIMLIC, and instead to place it with the Police Communications Officers, and to

suggest that had officer BUDIMLIC known that it was a hostage situation he would not have run into the house, or would otherwise have acted in a different manner.

38. On May 17, 2013, Nassau County Police Communications Officer id number 458 (PCO) received an emergency call through the 911 emergency system. The call began at approximately 02:25:45am from Shannon T (last name intentionally omitted), who stated within 5 seconds, "I have a guy in my house with a gun. He is holding my friends at gun point," and seconds later when asked for the address Shannon clearly stated "213 California Avenue. But don't go there.  He will shoot them." Within the first 15 seconds the PCO had enough information to establish that there was a hostage situation at her house located at 213 California Avenue, Uniondale, New York.

39. The call was categorized and put out over the air as a Robbery in Progress (ROBIP). The PCO then interviewed Shannon T, who confirmed the correct address, the location of the gunman in the house and that he was holding two girls and a guy in the upstairs bedroom to the right at gunpoint. Shannon T also gave the PCO a description of the man with the gun.  Shannon T answered all the PCO's questions accurately.

40. At some point during the 911 call the PCO informed Shannon that the police are at the house and Shannon responded, "Make sure they don't hurt them," stating her concern that the

14

police should not hurt her friends. The PCO reassured Shannon stating, "They are not going to hurt them," referring to the police officers not hurting the hostages.

41.   The PCO operator had information that there was a hostage situation in the house prior to any information being relayed over radio to radio communications with the officers of the 1st Precinct. The call type notification was a ROBIP.  The call type was never changed to the designation for a hostage situation.  Along with the call type of ROBIP the Nassau County PCOs relayed information over the air to the Police Officers consistent with a hostage situation, informing that there were people upstairs with a man with a gun and eventually stating that there were hostages in the house.

42.   The PCOs failure to inform police supervisors and police officers immediately that this was a hostage situation resulted in a breakdown in supervision of the officers at the scene by RICHARD ROES Police supervisors and a failure to immediately institute applicable NCPD police procedures, protocols, guidelines, Commissioner's Procedure Orders and good and accepted practices in hostage situations, which led to the shooting death of ANDREA REBELLO by Police officer BUDIMLIC.

43.   The hostages in the house were ANDREA REBELLO, JESSICA REBELLO and John Kourtessis.

44.   The hostage taker was Dalton Smith(Smith).

45.  On May 17, 2013 in response to the radio call of a
ROBIP at 213 California Avenue, Uniondale, New York (hereinafter
"the scene") JOHN DOES police officers from the 1st Precinct
responded to the call and went to the scene.

46.  The first police officers to arrive at the scene, on
May 17, 2013 were police officers JOSEPH AVANZATO, NIKOLAS
BUDIMLIC, MICHAEL LEONE and MARLON SANDERS, and other officers
arrived at the scene shortly thereafter.

47.  Police Officers JOSEPH LOBELLO, CHRISTOPHER ACQUILINO,
RAYMOND BUTTACAVOLI, DANIEL HEALEY, NICHOLAS ZAHARIS, DENNIS
WUNSCH, and RONALD RUSSO, also reported to the scene on May 17,
2013 before 3:00 am.

48.  On May 17, 2013, Police Officer D. STELLER reported to
the scene before 3:00 am.

49.  On May 17, 2013, Police Officer THOMAS CURTAIN reported
to the scene before 3:00 am.

50.  On May 17, 2013, Police Officer JOHN TUCKER reported to
the scene before 3:00 am.

51.  On May 17 2013, Police Sergeants ROBERT COHEN and
RICHARD HERMAN reported to the scene before 3:00 am.

52.  On May 17, 2013, Police Officer J. SCHOEPFER reported
to the scene before 3:00 am.

53.  On May 17, 2013, Police Officer E. JACOBSEN reported to
the scene before 3:00 am.

16

54. On May 17, 2013, Police Officer D. MCGARRIGLE reported to the scene before 3:00 am.

55. The house located at 213 California Avenue, Uniondale, New York was a small two story Cape.

56. When the first of the above-listed, or other JOHN DOES, officers arrived at the scene and approached the front door of the house, JESSICA REBELLO ran out of the house and yelled for help, informing the officers that there was a man with a gun and her sister still in the house.

57. After JESSICA REBELLO exited the house, there were many police officers at the scene, including those listed above, and more JOHN DOES were showing up. After JESSICA REBELLO exited the house, instead of debriefing her and getting information about the situation in the house as well as about the gunman, she was told by the officers to get back and was ignored until after shots were fired.

58. After JESSICA REBELLO left the house the front door remained open. Officers BUDIMLIC and SANDERS approached the open doorway as other JOHN DOES police officers took positions around the house.

59. BUDIMLIC observed Smith at the top of the stairs and heard him yelling that he had a gun prior to going into the house.

60.   BUDIMLIC failed to speak to JESSICA REBELLO or obtain any information about what was occurring in the house, how many people were in the house, how many hostages, how many hostage takers, how many men with guns or attempt any dialogue with JESSICA REBELLO before going into the house.

61.   Officer BUDIMLIC then went into the house and took up a position under the staircase leading upstairs, out of direct view from anyone upstairs who may look down.

62.   Before BUDIMLIC entered the house, the PCOs informed all police officers over the air that there were hostages in the house.

63.   Before BUDIMLIC went into the house, he transmitted a radio call over the air to Headquarters and to other officers on the air, that there was man with a gun and there were hostages.

64.   After BUDIMLIC went into the house, he transmitted a radio call over the air to Headquarters and to other officers on the air, that there was man with a gun and there were hostages.

65.   After BUDIMLIC went into the house, and while the doorway was still open, no other police officers entered the house before shots were fired.

66.   While the doorway was open and BUDIMLIC was in the house, other JOHN DOES officers including SANDERS, AVANZATO and LEONE saw a man with a gun at the top of the stairs. The man with the gun was later identified as Dalton Smith.

67.  SANDERS and AVANZATO were yelling back and forth with Smith telling him to drop the gun and Smith was responding and yelling back that they should drop their guns.

68.  SANDERS transmitted over the air that there were hostages in the house before shots were fired.

68.  BUDIMLIC transmitted over the air that there were hostages in the house before shots were fired.

69.  At all times when Smith was upstairs after police officers arrived at the scene and had taken up positions outside the house, other than yelling at Smith to drop his weapon and essentially yelling for him to surrender, no other negotiations took place. No hostage negotiations were ever attempted with Smith.

70.  No members of the NCPD who were specially trained in hostage negotiations were ever dispatched to the location to attempt to negotiate with Smith, despite the knowledge that a hostage situation was afoot.

71.  While Smith was upstairs and the doorway was open and Smith was yelling at the officers to put down their guns and leave, SANDERS considered taking a shot at him but when SANDERS saw the hostages in close proximity to Smith, he realized he could not safely take the shot.

72.  Smith had the male hostage, John Kourtessis, crawl to the top of the steps and put his hands one step down from the top

19

where the police officers could see them. Smith ordered
Kourtessis to yell to the police officers to leave the area.

73.   Smith made sure that Kourtessis's hands were visible to
the police at that time so that the police would not shoot
Kourtessis.

74.   At some point Smith asked Kourtessis to show him the
way out the back door of the house so Smith could escape.
Kourtessis began to lead Smith towards the back by crawling down
the steps in a controlled manner. Smith followed Kourtessis down
the stairs holding ANDREA REBELLO in front of him as a human
shield. As Smith, ANDREA REBELLO and Kourtessis got to the bottom
of the steps leading to the first floor, the front door closed.

75.   Prior to the front door closing BUDIMLIC had already
entered the house. When the front door to the house closed the
only police officer up to that point to enter into the house was
BUDIMLIC.

76.   Upon reaching the bottom of the steps Kourtessis turned
towards the back of the house.  As he started towards the back of
the house he immediately saw BUDIMLIC standing under the stairs
in the hall next to the kitchen. At that point Kourtessis yelled
to ANDREA REBELLO that it was going to be ok because the cops
were there and he quickly ran behind the couch separating the
living area from the kitchen.

77.  BUDIMLIC began shouting and yelling at Smith to drop his weapon. At no point in time did BUDIMLIC try to speak calmly, diffuse the situation, deescalate or scale down the situation in any way.

78.  At no point did BUDIMLIC follow the procedures indicated in Commissioner's Procedural Order 7-95 for Hostage/barricade situations.

79.  From the point where Smith and BUDIMLIC faced off until BUDIMLIC fired his weapon, at all times, BUDIMLIC had his weapon pointed in the direction of ANDREA REBELLO.

80.  As Smith was backing up, BUDIMLIC kept pressing and moving forward pointing his gun at Smith and ANDREA REBELLO.  At no point after BUDIMLIC and Smith were face to face did BUDIMLIC attempt to take any steps to deescalate, back off or to retreat.

81.  Smith was backing towards a set of steps leading down to a landing which had a doorway to get out of the back of the house.

82.  When Smith was on the steps leading down to the landing, still holding ANDREA REBELLO, BUDIMLIC fired his first two shots.

83.  At the point in which officer BUDIMLIC was standing in front of the steps with his gun pointed at ANDREA REBELLO and Dalton Smith at all times officer BUDIMLIC was pressing forward, putting ANDREA REBELLO in greater danger.  This was in violation

of good and accepted police practices as well as Commissioner's Procedural Order, order no. 7-95 titled ·Procedure Relating to Hostage/Barricade Incidents.

84.  At the time officer BUDIMLIC fired the first two shots, Smith and ANDREA REBELLO were on the steps below him.

85.  At all times prior to officer BUDIMLIC firing his weapon Smith was holding ANDREA REBELLO in front of him as a human shield.

86.  At the point in time when police officer BUDIMLIC fired his weapon the first two shots entered into Dalton Smith's chest.

87.  After being shot twice in the chest Dalton Smith, with his arm still holding around ANDREA REBELLO 's neck and head, fell down into the landing area, at which point ANDREA REBELLO had not yet been shot.

88.  After Dalton Smith fell - while ANDREA REBELLO was still within BUDIMLIC's grasp, with his arm around her neck and with both of them laying down, and with Smith completely incapacitated on the floor and no threat to BUDIMLIC - BUDIMLIC climbed down several steps, stood above ANDREA REBELLO and Dalton Smith, and proceeded to fire 5 to 6 more shots at Dalton Smith while his arm was still around ANDREA REBELLO's neck and head area.

89.  BUDIMLIC claimed he fired three sets of shots.

90.  All other officers and witnesses only heard two sets of

shots, the first set consisting of two shots, and then the second
set consisting of six shots.

91.   It was a bullet from the second or third set of shots
that killed ANDREA REBELLO.

92.   At the point time when BUDIMLIC fired the bullet that
killed ANDREA REBELLO she not a threat to BUDIMLIC and at the
point in time when BUDIMLIC fired the bullet that killed ANDREA
REBELLO, Dalton Smith was not a threat to BUDIMLIC.

93.   At the point time when BUDIMLIC fired the bullet that
killed ANDREA REBELLO, Dalton Smith was not a threat to ANDREA
REBELLO.

94.   At the point time when BUDIMLIC fired the bullet that
killed ANDREA REBELLO, Dalton Smith had been shot two times and
was laying on the floor.

95.   When BUDIMLIC fired the bullet that killed ANDREA
REBELLO she was laying on the floor with Dalton Smith's arm still
around her neck and head area.

96.   Approximately five to ten seconds elapsed from the time
the first two shots were fired by BUDIMLIC, before he fired the
second round of shots.

97.   After firing the first two shots BUDIMLIC approached
both Dalton Smith and ANDREA REBELLO - while ANDREA REBELLO was
still alive - and then he proceeded to fire bullets right into
Dalton Smith and ANDREA REBELLO with complete disregard to the

23

life of ANDREA REBELLO as well as Dalton Smith.

98.  BUDIMLIC fired the bullet that killed ANDREA REBELLO
with deliberate indifference to ANDREA REBELLO's life, well-being
and safety, and in a manner that shocks the conscience,
regardless of which of the eight bullets that BUDIMLIC fired
killed her.

99.  At the time the shots were fired, ANDREA REBELLO was in
immediate proximity to Smith and was in obvious danger of being
hit by any and all shots fired in her direction.

100. At the moment that BUDIMLIC fired his gun for the first
time Smith's gun was pointed at ANDREA REBELLO and not at
BUDIMLIC.

101. Subsequent testing revealed that Smith's gun was
inoperable at the time it was tested.

102. At all times after the first two shots were fired
Dalton Smith was incapacitated, and officer BUDIMLIC was aware
that his gun was inoperable. At the point in time when he fired
the second set of shots Dalton Smith's right hand (gun hand),
arm, and body were positioned in such a way that he could not
have been pointing the gun at ANDREA REBELLO.

103. At all times after the first two shots were fired
Dalton Smith was incapacitated and officer BUDIMLIC was aware
that his gun was inoperable. At the point in time that he fired
the second set of shots Dalton Smith's right arm and body was

24

positioned in such a way that he could not have pointed the gun at BUDIMLIC.

104. As BUDIMLIC was shooting he got closer to Dalton Smith, almost within 12 inches, and was shooting into his side when Smith and Rebello were completely helpless.

105. At no point did Dalton Smith fire his weapon.

106. BUDIMLIC shot a total of eight (8) bullets from his gun.

107. After shooting the eight (8) bullets, BUDIMLIC observed Smith to be lying down on the landing and incapacitated, at which point he removed the gun from Smith's hand.

108. At no point in time after ANDREA REBELLO was struck by a bullet did BUDIMLIC render any aid to her.

109. Immediately after shooting ANDREA REBELLO in the head police officer BUDIMLIC picked Andrea up off of Smith or moved her while she was still bleeding after being shot, and leaned her forward onto the bottom step of the stairs.

110. BUDIMLIC then proceeded to get on his radio, to call for help, and attempted to cuff Dalton Smith, who was clearly incapacitated.

111. When BUDIMLIC moved ANDREA REBELLO he got her blood on his hands and clothes.

112. BUDIMLIC immediately began to scream hysterically over the airwaves that he needed help in the house and everyone should

stay off the airwaves. BUDIMLIC, while he was on the landing, continued to attempt to cuff Smith and then received help from officer RUSSO.

113. BUDIMLIC attempted to handcuff Smith after Smith was already dead or dying from multiple gunshot wounds.

114. BUDIMLIC claims that at no point in time after he fired the eight (8) bullets did he touch or move ANDREA REBELLO.

115. BUDIMLIC fired the bullet that killed ANDREA REBELLO.

116. BUDIMLIC initially denied shooting ANDREA REBELLO.

117. BUDIMLIC initially told NCPD personnel at the scene that Smith had shot ANDREA REBELLO.

118. BUDIMLIC, by telling other NCPD personnel that Smith shot ANDREA REBELLO, derailed the investigation +away from him.

119. Officer SANDERS and others came into the house within minutes of the shots being fired.  SANDERS went to the back steps and saw that ANDREA REBELLO was at the bottom of the stairs with her body on the landing and her head on the bottom step. At that time BUDIMLIC was near Smith also on the landing.

120. SANDERS immediately saw that ANDREA REBELLO had been shot and injured but was still breathing. SANDERS and at least one other unknown officer proceeded to bring ANDREA REBELLO up from the landing area by the back door, up the stairs, and into the kitchen area for medical treatment.

121. Until other officers arrived at the back stairs, BUDIMLIC claims he was unaware that ANDREA REBELLO was injured.

122. When ANDREA REBELLO was in the kitchen, Sergeant HERMAN, who entered the house after the shooting, both saw and heard that ANDREA REBELLO was moaning as she was in the kitchen being attended to by police officers and EMS.

123. Immediately after the shooting the Defendant Nassau County Police Department officers, including BUDIMLIC, began to cover up their wrongdoing.

124. The police officers accounts of what occurred next, and what they observed, was the beginning of a massive cover-up to protect officer BUDIMLIC, as well as NASSAU COUNTY and other members of the Nassau County Police Department, from liability.

125. At the point in time where officer BUDIMLIC was on the landing after shooting both Smith and Rebello he was attempting for several minutes to cuff Smith, cuffed one hand, and then eventually got assistance from officer RUSSO in completing the cuffing.

126. Officer Budimlic then was escorted out of the house and immediately brought to the hospital before being asked for a formal statement or to submit to a forensic examination of any kind.

127. Police Officer RUSSO responded to the crime scene and entered the house, went down onto the landing where BUDIMLIC and Smith were, and proceeded to help BUDIMLIC cuff Smith.

128. RUSSO after cuffing Smith remained in the area of the shooting – on the landing - for some period of time.

129. After Smith was cuffed, Russo with his foot moved Smith's gun away from where Smith was lying on the floor over towards the wall.

130. In order for RUSSO to assist BUDIMLIC in putting handcuffs on Smith he had to step over or around ANDREA REBELLO, who was laying on the floor at the bottom of the steps at that time.

131. The Defendant officers named herein, and the other JOHN DOES officers who were present at the crime scene, along with the Defendant supervisory officers named herein, and the other RICHARD ROES supervisory officers, spoliated and fabricated evidence as detailed below in paragraphs a - p.

a.   After the shooting RUSSO began moving evidence and throwing boxes and other debris that was in the stairway around, thereby spoliating the crime scene and fabricating evidence.

b.   While RUSSO was standing on the landing, and Smith was cuffed on the landing as well, AMTs came to the back door.

c.   RUSSO continued to destroy the crime scene and move evidence around, moving debris and opening the back door instead of asking the AMTs to come around to the front.

d.   RUSSO moved evidence around and in the process moved forensic evidence, caused blood to transfer to locations where it had not been, and generally altered the crime scene dramatically.

e.   RUSSO, after opening the back door, ripped Smith's backpack off of his body and threw it out the back door all the way (5-8 feet) against the back fence of the property.

f.   During the process of RUSSO altering the crime scene and moving evidence around, he created blood spatter where previously there was none, got blood all the way on the outside back fence despite the door being closed at the time of the shooting, and got blood on the outside of the back door where there had been none previously from the shooting.

g.   None of the Defendant officers or Supervisors stopped RUSSO, or instructed him on proper crime scene protocol, or attempted to prevent him from altering the crime scene and spoliating and fabricating evidence.

h.   RUSSO, by ripping the backpack off Smith and throwing it out the back door, created blood spatter and drips all over the crime scene and even outside where previously there had been

none.

i.   RUSSO had blood on his hands and touched various locations
     in and around the crime scene, creating blood transfer and
     altering and fabricating evidence at the crime scene.

j.   RUSSO along with other NCPD personnel turned Dalton Smith
     over and dragged him out the back door so that his head hung
     over the threshold of the back door, disturbing his final
     resting place after the shooting.

k.   RUSSO gave no aid to Dalton Smith.

l.   BUDIMLIC gave no aid to Dalton Smith.

m.   RUSSO, along with other Defendant Officers present at the
     scene, conspired with BUDIMLIC to alter the crime scene to
     avoid civil and criminal liability for BUDIMLIC, the COUNTY OF
     NASSAU, and the other members of the NCPD involved.

n.   Officer RUSSO was in no way disciplined for his failure to
     follow good and accepted police practices for crime scene
     integrity, or his failure to follow the department manual's
     requirements for conduct of an officer the crime scene.

o.   Upon information and belief RUSSO and the other Defendant
     Officers failed to follow the Nassau County policies and
     procedures for crime scenes, good and accepted crime scene
     procedures, and failed to follow crime scene duties pursuant
     to NCPD Department Manual Sections OPS 8115 and OPS 8201.

p.   JOHN DOES Officers, and RICHARD ROES Supervisors, were in no

way disciplined for their failure to follow good and accepted police practices, along with the department manual's requirements for conduct of officers at a crime scene.

132. Shortly after the arrival of other police officers, BUDIMLIC exited the house and went into the back of an ambulance with Sergeant COHEN, and Officers MCGARRIGLE and RUSSO. He was then taken to Nassau County University Medical Center.

133. Officer SANDERS was allegedly "shaken up" and taken to Nassau County University Medical Center as well, where he shared a room with BUDIMLIC.

134. Earlier, when JESSICA REBELLO exited the house she immediately crossed the street to find a place of safety. The JOHN DOES police officers at the scene yelled at her to get behind cars. At no time before the shooting took place did any JOHN DOES officers attempt to get further information from her about the circumstances and tactical situation in the house.

135. After exiting the house, at no point was any effort made by any of the JOHN DOES members of the NCPD to comfort or provide access to treatment for the trauma JESSICA REBELLO had experienced that morning. Police Officer ZAHARIS took custody of JESSICA REBELLO, ordered her to get into a Nassau County Police cruiser and ordered her not to leave it. Once in his police cruiser, ZAHARIS kept her at the scene for 3-5 hours (most of that time spent against her will in the police car). This was

either of his own volition or at the direction of RICHARD ROES NCPD supervisors and/or commanders that came to the scene after the shooting took place.

136. At no point after JESSICA REBELLO was placed in the police car was she allowed freedom of movement, even though she was never suspected of any crime.

137. There was no valid police purpose for restricting JESSICA REBELLO's movements, or denying her permission to call her mother after BUDIMLIC had shot her sister. ZAHARIS took custody and control over JESSICA REBELLO and then handed that control over to other JOHN DOES NCPD officers or RICHARD ROES supervisors, and eventually to DETECTIVE MARTIN J. HELMKE.

138. At the precinct HELMKE forced JESSICA REBELLO to give a signed statement about the events that she recollected that morning even though she was not in the house when the shooting took place.

139. JESSICA REBELLO was kept at the scene for hours, positioned by ZAHARIS to view her sister being brought out of the house by EMS on a stretcher and placed into an ambulance, was prevented from sitting with her friend John Kourtessis, and, worse yet, was not even allowed to call her mother. JESSICA REBELLO was left alone for long periods of time in the police car, adding to her fear and anxiety.

140. After the sun started coming up JESSICA REBELLO was brought into the mobile command vehicle that JOHN DOES members of NCPD brought to the scene and was told at that time that her sister had been killed, but she was not told who killed her sister. After being told that her sister had been killed, instead of being released and allowed to call her mother or being treated by EMS at the scene, JOHN DOES members of the NCPD continued to maintain custody and control over JESSICA REBELLO. ZAHARIS and other JOHN DOES kept her at the scene until some JOHN DOE(S) within the NCPD felt like bringing her to the Precinct to have her statement taken.

141. JESSICA REBELLO was begging to be allowed to call her mother, and said request was refused and/or ignored repeatedly. ZAHARIS and other JOHN DOES members of the NCPD failed to have JESSICA REBELLO examined by EMS personnel at the scene or taken to the hospital, despite the obvious trauma JESSICA REBELLO suffered due to being held hostage that morning and her sister being killed by BUDIMLIC.

142. JESSICA REBELLO was treated like a perpetrator, instead of a victim who was supposed to be protected by the JOHN DOES members of the NCPD. She was held at the scene for hours and then transported to the Precinct to give a statement while she was completely exhausted. The JOHN DOES members of the NCPD had no legal basis to take custody of JESSICA REBELLO or to restrict

33

her movement. Certainly they could have and should have let her call her mother. While JESSICA REBELLO was being callously held in a police cruiser with a male officer for hours, BUDIMLIC and SANDERS were immediately taken to the hospital to treat their "trauma". Neither SANDERS nor BUDIMLIC had physical injuries. Neither were held hostage, but yet the RICHARD ROES supervisors at the scene were only concerned with their officers' wellbeing and had them taken to the hospital. In contrast, JESSICA REBELLO - who had been taken hostage, heard shots, was clearly terrified and traumatized, and came to learn her sister had been killed - was never permitted to be treated by any of the numerous EMS personnel at the scene, nor was she taken to the hospital. Instead she was taken to the Precinct so that the JOHN DOES members of the NCPD could take a statement from her at their convenience.

143. JESSICA REBELLO was taken to what is believed to be the 1st Precinct. She was forced to give a statement by HELMKE, was not allowed to leave or to see her mother who at that point had come to the precinct, and was kept isolated from her mother until the Detective finished taking her statement.

144. JESSICA REBELLO was placed in custody and at no time was she a suspect in the shooting death of her sister ANDREA REBELLO. Her movements were illegally restricted so that HELMKE,

COUNTY and other JOHN DOES AND RICHARD ROE members of the NCPD could maintain media control over the event.

145. NELLA REBELLO and FERNANDO REBELLO arrived at the police precinct to see JESSICA REBELLO in the late morning of May 17, 2013. When they arrived at the Precinct they were not permitted to see JESSICA REBELLO until JOHN DOES members of the NCPD and HELMKE permitted them access to their daughter, JESSICA REBELLO.

146. JESSICA REBELLO was finally released from custody at approximately 9 am.

147. After NELLA and FERNDNDO REBELLO were allowed to see JESSICA REBELLO, they waited at the Precinct for the autopsy of ANDREA REBELLO to be completed so they could identify the body. They waited several hours in the Precinct until their daughter was ready to be identified. At no point in time did anyone on behalf of the COUNTY or the NCPD inform NELLA REBELLO, FERNANDO REBELLO or JESSICA REBELLO that BUDIMLIC, a Nassau County Police Officer, was the person who shot and killed ANDREA REBELLO.

148. The next day, on May 18, 2013, representatives of the COUNTY and NCPD including Commissioner DALE, went to the Rebello home to inform the Rebello family that an NCPD officer shot and killed ANDREA REBELLO. They delivered to the Rebello family a picture of Dalton Smith and his rap sheet showing his criminal history, but they did not identify the officer who shot and

killed ANDREA REBELLO. They did not provide any information about the manner in which, or the reason why, BUDIMLIC had shot and killed their daughter nor did they provide any information about BUDIMLIC's background or tell the family that BUDIMLIC had been involved in two other shootings prior to this one. They did not inform the family at that time that the NCPD Deadly Force Team had already determined on May 17th, the same day of the shooting, that BUDIMLIC was found to be justified in shooting ANDREA REBELLO.

149. BUDIMLIC was in two prior shootings, one of which he described as a gun battle.

150. Although BUDMILIC did not have the temperament or deportment befitting a POLICE officer, after this shooting BUDIMLIC was put back on duty, after now having been in three shootings and suffering no discipline, retraining or additional evaluation following any of the shooting incidents.

151. Nassau County Police Department officers, including the Defendant officers herein, were not trained for hostage situations.

152. The Defendant Nassau County Police officers who were first present at the scene before any supervisors arrived were not trained for hostage situations.

153. BUDMLIC was not provided training for hostage barricade situations by the Nassau County Police department.

154. BUDMLIC was not provided access to the hostage/barricade procedures alleged by the County to be in effect on the date of the shooting.

155. The Plaintiffs, through FOIL litigation, were provided a complete but redacted version of the Nassau County Department Manual in effect on May 17, 2013.

156. The Nassau County Police Department Manual Section for hostage barricade incidents in effect on May 17, 2013 was not contained within the Department Manual, as it was missing from the content as well as the table of contents.

157. The Nassau County Police Department manual that was in effect on May 17th 2013 states that its purpose is to provide a source of reference to all members of the department. The policies communicate objective goals, and philosophies, and the rules direct the conduct, behavior and actions of the members of the department. The procedures provide guidelines and standardize methods of response to common situations.

158. The written procedures of the department, according to Section Admin 113, is to develop and publish department policies, rules and procedures that provide direction and guidance to its members.

159. The Nassau County Department manual contains operational procedures entitled OPS with a section number. The OPS Section 1155 {effective date August 31, 2001} for mentally

disabled persons essentially states that if a mentally disabled person situations evolves into a hostage situation then the Police Officers should look to OPS Section 2112 entitled Hostage\Barricade Incidents Procedures, which in fact is not contained within said department manual.

160. The OPS sections of the department manual in effect on May 17, 2013 are contained within the 12000s sections for tactical methods and special events which has Section OPS 12111 Bombs and Bomb Threats, the next numerical Section being ops 12113 Hazardous Material Incidents. Therefore, the department provided no department manual section for hostage barricade incidents, in violation of good and accepted police practices.

161. In a letter dated May 27, 2015 the Nassau County Police Department claimed that Police Commissioner's Procedural Order, Order no. 7-95 titled Procedure Relating to Hostage/Barricade Incidents was in effect on the date of the shooting.

162. Despite said claim no section of the Department Manual references said Commissioner's Procedural Order. Additionally, OPS Section 12111 is dated June 2, 2000 and OPS section 12113 is dated October 19, 2001 clearly indicating that section 12112 which should have been written sometime between 2000 and 2001 and accessible to the police officers for guidance was simply not there, despite the fact that police officers of Nassau County would be faced with these situations at some point in time to a

moral certainty.

163. If Commissioner's Procedural Order, order no. 7-95 titled Procedure Relating to Hostage/Barricade Incidents had been in effect (which Plaintiffs dispute) the Defendant police officers and police supervisors, and the police communications operators, violated the procedures contained in said Commissioner's Procedural Order.

164. Commissioner's Procedural Order, order no. 7-95 was violated by the Defendant supervisors at the scene, including sergeants HERMAN and COHEN, by their failing to properly supervise the officers at the scene.

165. Commissioner's Procedural Order, order no. 7-95 was violated by the Defendant supervisors at the scene, including sergeants HERMAN and COHEN, by their failing to establish a perimeter and limit access to the hostage taker to hostage negotiators and/or Bureau of Special Operations or other personnel specifically authorized by the incident commander.

166. The County of Nassau, and its Defendant Police Officers and Supervisors, including officer BUDIMLIC, failed to adhere to Commissioner's Procedural Order, order no. 7-95 requirement of establishing firearms discipline.

167. The COUNTY of Nassau and its Defendant police officers and supervisors, including supervisors COHEN and HERMAN as well as officer BUDIMLIC, violated the purpose of the aforementioned

Commissioner's Procedural Order, the primary goal of which in any hostage barricade incident is to protect all human life by providing for the safe release of any hostages and the surrender of the subject while minimizing any risk to the police personnel.

169. BUDIMLIC, COHEN, HERMAN, RICHARD ROES, and JOHN DOES police officers additionally violated the policy of the department regarding hostage barricade incidents according to the Commissioner's Procedural Order, Order no. 7-95 that requires an attempt to utilize the principles of negotiation wherever circumstances permit this approach, and emphasizes use of communication and time to de-escalate the situation, thereby decreasing the potential for violence while working towards a lawful resolution.

170. Each and every act of the Defendants present at the scene prior to the shooting, including the supervisors and BUDIMLIC as detailed herein, violated this policy, and no efforts to deescalate the incident were attempted by any police officer at the scene, including BUDIMLIC.

171. The conclusion listed in Commissioner's Procedural Order, order no. 7-95 embodies good and accepted police practices and was violated by COHEN, HERMAN, BUDIMLIC and every officer and supervisor involved with the shooting, as no attempt at negotiation was attempted. The conclusion states that one of the most basic concepts in a hostage negotiation is to use

conversation in time to slow the movement of events and thereby provide the opportunity to reduce tension and anxiety. Indeed, statistical data strongly indicates that negotiations are more successful than tactical responses in saving lives and reducing the likelihood of injury for all involved, and therefore the department's policy is that negotiation is the preferred course of action for members responding to assignments involving hostages or and/or barricaded persons.

172. Whether or not Commissioner's Procedural Order, Order no. 7-95 was in effect the Defendant police officers and supervisors that arrived at the scene or heard the Police Communication transmissions regarding this incident as it was unfolding, including defendant  BUDIMLIC, were not properly trained to follow good and accepted police practices regarding Hostage incidents or the procedures specifically contained in Commissioner's Procedural Order, Order no. 7-95

173. When the call came through that there were people in the house and there were hostages being held at gunpoint or people being held at gunpoint the Defendant supervisors were not trained to respond appropriately to the hostage situation, failed to actually appreciate that it was a hostage situation, failed to take control of the situation, and failed to make sure that all of the officers followed good and accepted police practices, including Commissioner's Procedural Order, order no. 7-95, if it

was in effect.

174. BUDIMLIC entered the house with deliberate indifference to the hostages' wellbeing.

175. When Officer BUDIMLIC entered the house he ignored the department manual procedures and good and accepted police practices by failing to attempt to speak with Jessica Rebello who was exiting the house, to ascertain the situation and get the appropriate facts prior to entering the premises.

176. When BUDIMLIC entered the premises, in violation of good and accepted police practices as well as Commissioner's Procedural Order, Order no. 7-95 and any other hostage training he may have had, he created a danger to the hostages, himself, as well as the other police officers at the scene.

177. BUDIMLIC created a danger for ANDREA REBELLO, himself, and the other police officers at the scene by entering the house and failing to make any effort whatsoever to deescalate the situation.

178. BUDIMLIC created a danger for ANDREA REBELLO, himself, and the other police officers at the scene by entering the house without getting instructions from the Defendant supervisors, including COHEN, HERMAN or anyone else in command.

179. Defendant supervisors, including COHEN and HERMAN, were a significant causal factor in BUDIMLIC's creating a danger to ANDREA REBELLO, by failing to give BUDIMLIC instructions over the

air or in person that he and everyone else there should wait for the Hostage negotiators, or supervisors, or for further instruction before taking any action of entering the house or escalating the need for the use of force.

180. Immediately after this officer involved shooting took place the cover-up of this shooting incident began to mobilize.

181. The defendants herein failed to properly investigate this officer involved shooting, investigate the crime scene, conduct a proper investigation concerning an officer involved shooting where the officer commits a double homicide, failed to preserve forensic evidence, and in addition they spoliated evidence and fabricated evidence to attempt to protect BUDIMLIC, the COUNTY, and the other Defendants from liability and deny the PLAINIFFS fair access to the Courts. These actions of the Defendants are detailed below.

182. BUDIMLIC after shooting both Smith and Rebello began screaming for his colleagues to stay off the air in attempt to keep all information about the shooting off the air. There was no concern for Andrea, Smith or anyone other than himself and only a concern for keeping the truth of what happened from the media and the public.

183. Before firing his weapon but after entering the house BUDIMLIC claimed his radio was not working and therefore he could not communicate, but there was no subsequent testing of his radio

by defendants to confirm or deny said statement.

184. At no point over the air was it ever stated that officer BUDIMLIC or a Nassau County police officer had shot and killed ANDREA REBELLO. The Nassau County Police Department's first concern was to cover up the incident and keep it from the media's attention.

185. The Defendants immediately began both protecting BUDIMLIC, the COUNTY, and the other Defendants by covering up that an officer shot ANDREA REBELLO.

186. Based upon FOIL responses no Internal Affairs Bureau investigation of BUDIMLIC's shooting and killing two people was conducted, in derogation from good and accepted officer involved shooting investigation practices. Commissioner DALE at the time could have ordered and requested IAB to conduct an investigation, but did not. An IAB investigation would have uncovered various violations of NCPD policy committed by not only BUDIMLIC but the other Defendant officers and supervisors at the scene.

187. Shortly after the shooting BUDIMLIC was escorted out of the house, given a care taker officer, and immediately brought to the hospital before a formal statement of any kind was taken of him.

188. The Defendant Officers and Supervisors, including Defendant crime scene investigators and Defendant homicide investigators and Defendant members of the deadly force team, in

contravention of good and accepted police investigative techniques in officer involved shootings, did not have any photographs taken of BUDIMLIC's hands, clothes or his shoes.

189. The Defendant Officers and Supervisors, including Defendant crime scene investigators and Defendant homicide investigators and Defendant members of the deadly force team, in contravention of good and accepted police investigative techniques in officer involved shootings, did not have any forensic examination conducted of BUDIMLIC's hands, clothes or his shoes.

190. The Defendant Officers and Supervisors, including Defendant crime scene investigators and Defendant homicide investigators and Defendant members of the deadly force team, in contravention of good and accepted police investigative techniques in officer involved shootings, failed to preserve BUDMILIC's clothes, shoes and/or gloves in their condition immediately after the shooting.

191. Had forensics been gathered of BUDMILIC, such as his clothes, hands and/or shoes it would have contradicted statements given by BUDIMLIC to both the NCPD and the District Attorney's office regarding his actions before and after the shooting and the contact he had with ANDREA REBELLO.

192. The only testing that was done regarding BUDMILIC's was on his gun.

193. The DNA testing that was done by NCPD was selective and self-serving.

194. As previously stated immediately after the shooting BUDIMLIC told NCPD personnel that Dalton Smith had shot and killed ANDREA REBELLO and, as Smith was dead, the investigation was thereby deflected away from investigating BUDMILIC.

195. Immediately after the shooting JESSICA REBELLO and John Kourtessis, witnesses to the events, were held and required to give statements while they were exhausted. Defendants forced Jessica and John Kourtessis to sign the statements without the benefit of reading them. When Kourtessis at a later interview refuted certain various important parts of the statement no further action was taken in investigating this officer involved shooting or revisiting the Deadly Force team's report which in part relied on his statement.

196. The Defendant Officers and Supervisors, including Defendant Police supervisors, Defendant crime scene investigators and Defendant homicide investigators and Defendant members of the deadly force team, instead of requiring BUDIMLIC to give a similar sworn statement, audio statement or video statement, took his statement without it being recorded or signed and sworn to in front of a notary, or even endorsed by him, in contravention of good and accepted practices for officer involved shooting protocol.

197. The Defendant Officers and Supervisors, including Defendant Police supervisors, Defendant crime scene investigators and Defendant homicide investigators and defendant members of the deadly force team, never required a single police officer who witnessed the shooting and the events leading up to and immediately after this shooting, to give a signed statement, a statement in their own handwriting, an audio recorded statement, or a video recorded statement, in order to allow them to be able to change their testimony as necessary to shield Defendants from liability.

198. Interviews were conducted by the Deadly force team, the Homicide detectives and the District Attorney's office where defendants GOLDMAN, FITZPATRICK AND HENDRY were present, and not a single one of the Defendant Officers so much as took out their phones and recorded these statements, either by audio or video, made by the Defendant officers who were at the scene, including BUDIMLIC. This was in contrast to all the other witnesses, all of whom were required to sign statements, written by NCPD officers.

199. The Nassau County Police Department has procedures and protocols for the deadly force team that investigates shootings as well as the use of deadly force.

200. The Nassau County department manual section Admin 1221 governs the procedures for the Deadly Force Response Team. The

team in this case consisted of the top ranked officers generally considered the most knowledgeable about police practices within the Nassau County Police Department.

201. The deadly force response team in this case consisted of defendants CHIEF LORRAINE A. HANNON, Chief of Support, DEPUTY INSPECTOR JOSEPH MAGRANE, Commanding Officer, 1st Precinct, DEPUTY INSPECTOR DANIEL FLANAGAN, Commanding Officer, Police Academy, LIEUTENANT HARUN BEGIS, Commanding Officer, Firearms Training Unit, DETECTIVE SERGEANT STEPHEN FITZPATRICK, Homicide Squad, and they conducted their perfunctory and abjectly inadequate investigation and issued a report.

202. Nassau County Department Manual Section Admin 1221 required the Deadly Force Response Team to issue a report before the next business day.

203. The policies and procedures outlined in section Admin 1221 lead to reports being issued, and determinations made whether the force was justified or not, prior to a full and proper investigation, and only permit a limited amount of information to be ascertained by the Team prior to the issuance of the required report.

204. In this instance the Deadly Force Response Team report was issued the same day as the shooting, on May 17th.

205. The Deadly Force Response Team determined that the shooting was justified.

206. The policies and procedures articulated in the manual and used by the Defendant COUNTY caused the Deadly Force Response Team to issue a report without having the opportunity to review an autopsy report, autopsy findings, scene diagrams or any other forensic analysis that could corroborate the accounts of the police officers.

207. The interviews conducted by the Deadly Force Response Team of the officers at the scene often were sparse and for the most part consisted of two or less pages of notes.

208. Once the Deadly Force Response Team determined that the shooting was justified the entire investigation focused away from BUDIMLIC and focused on shielding BUDIMLIC and the other Defendants from liability.

209. The police department did not conduct any investigation into the multiple and various versions of police officers' accounts of the shooting.

210. In this matter the Nassau County Police Department has stated that they forwarded the entire homicide investigative files through a FOIL response of approximately 2200 pages of documents to the plaintiffs' attorneys herein.

211. The Nassau County Police Department has represented to not only the plaintiffs' attorneys, but the Appellate Division Second Department of New York State, that this response contained the entire homicide file and investigative files of this

incident.

212. NCPD department manual Admin 1220 requires that a firearm discharge report be prepared in this matter, and even that basic requirement was not followed for officer BUDIMLIC, who clearly and admittedly discharged his weapon.

213. The Defendant supervisors, including LT. JOHN AZZATA and THOMAS DALE, failed to require and cause said firearm discharge report to be filled out.

214. At no point did BUDIMLIC give any statement that was consistent with the forensic evidence in this case.

215. The COUNTY caused an autopsy to be conducted by doctors at the Nassau County Medical Examiner's Office of both Smith and ANDREA REBELLO.

216. The autopsy report issued by the medical examiner's office had various findings that were contradictory to the conclusions reached by the Defendants in the investigation of this case, and to the various statements BUDIMLIC gave to the NCPD and District Attorney's Office.

217. The autopsy report revealed groupings of bullets consistent with at least 2 sets of shots.

218. At no point was any statement given by BUDIMLIC to the COUNTY, its investigating Defendant police officers and supervisors, or the district attorney's office, consistent with the autopsy reports or the forensic crime scene evidence, despite

much of the evidence being altered and fabricated.

219. The statements that BUDIMLIC gave all had both Smith and Rebello below him on the stairs or at least even with him when he fired the first set of shots.

220. After the first set of shots BUDIMLIC claimed that ANDREA REBELLO crouched down on the bottom step either of her own volition or in response to his instructions.

221. At no point was BUDIMLIC asked what he saw after he fired his gun as to the reactions of either Smith of ANDREA REBELLO.

222. At no point was he asked to explain in any detail as to where he saw his bullets hit each time he fired his gun for each shot or group of shots.

223. At no point did any of BUDIMLIC's statements as to how and when he fired at Smith and ANDREA REBELLO correspond in any way to the autopsy evidence or the forensic crime scene evidence.

224. The Autopsy report was not consistent with ANDREA REBELLO being shot and killed with one of the first two shots.

225. After obtaining the results of the autopsy report the COUNTY, its officers, its investigating Defendant detectives, and the Defendants' deadly force response team, failed to compare the results with BUDIMLIC's statements.

226. The Defendants' Deadly Force Shooting Team never revisited the statements given by BUDIMLIC and compared them with

the autopsy of ANDREA REBELLO to determine whether or not officer BUDIMLIC had been telling the truth during this investigation, and to revisit whether the shooting was justified.

227. At no point in time was officer BUDIMLIC ever asked by anyone on behalf of the Nassau County Police Department which shot that he fired that he believed hit ANDREA REBELLO, or could have struck ANDREA REBELLO.

228. At no point was any recording generated by anyone investigating this officer involved shooting on behalf of the Nassau County Police Department of any question and answer as to which shot BUDIMLIC believed struck or could have struck ANDREA REBELLO.

229. BUDIMLIC was never asked to even hazard a guess which of the shots that he fired was the one that killed ANDREA REBELLO.

230. The crime scene investigation evidence collection and diagram directly conflicts with multiple statements given by BUDIMLIC.

231. The lack of questioning initially by the very experienced Nassau County defendant police detectives and any follow up as to the discrepancies between the statements taken from BUDIMLIC and the forensic and Autopsy reports is compounded with the lack of a signed, audio or video statement by BUDIMLIC or any officer.

232. The Nassau County district attorney's office conducted an investigation into this shooting and issued a report in April 2014. The DA's investigation included interviewing numerous police officers, including BUDIMLIC.

233. The defendants GOLDMAN and/or FITZPATRICK were present for all of the interviews and HENDRY was present for at least one of the interviews.

234. The defendants GOLDMAN, FITZPATRICK and HENDRY failed to record any of the interviews taken by the District Attorney's office or ask a single question to clarify any inconsistencies with prior statements, forensic evidence or the autopsy reports.

235. The Defendants ignored blatant inconsistencies concerning BUDIMLIC's reason for shooting at Smith while in contact with ANDREA REBELLO in statements given to the Nassau County Police Lieutenant JOHN AZZATA and the to the District Attorney's office.

236. LT. AZZATA gave a press conference, reporting to the public what happened.

237. LT. AZZATA personally spoke with BUDIMLIC to get his version of what happened prior to his press conference.

238. The information LT. AZZATA reported to the public at the press conference was what was told to the Deadly Force Shooting Team.

239. The information LT. AZZATA reported to the public at the press conference was what was told to NCPD officers who personally spoke with BUDIMLIC and reported back to LT. AZZATA what was told to them.

240. LT. AZZATA, spokesman for the Nassau County Police Department, on MAY 18 or 19th 2013 at a press conference stated, after giving some background and details leading up to the shooting, in pertinent part that "Smith is holding ANDREA REBELLO. When he realizes there is a police officer in the house he moves ANDREA REBELLO even closer to the front of his body. He is backing out towards that back door. He still has the gun pointed at the victim's head, eventually menaces our police officer, points his gun at the police officer and at that point the police officer fires his weapon several rounds."

241. Although Plaintiffs dispute the factual conclusions in the report, the District Attorney's report detailed the events as told to them by BUDIMLIC concerning the seconds before the shooting as follows:

> According to Officer Budimlic, while Smith was attempting to descend backward down the set of steps, Smith began losing control over ANDREA REBELLO. Smith was trying to retain control over her, but Smith's arm was becoming looser around her neck. Officer Budimlic observed ANDREA REBELLO begin to turn her body away from Smith, leaving a larger portion of Smith's body more exposed. Officer Budimlic was able to see more of Smith's body mass, including his shoulder, which had previously been shielded by ANDREA REBELLO. Officer Budimlic observed Smith to be off balance. At that moment, Smith once again pointed his gun at ANDREA REBELLO's head yelling, "Fuck

you, I'll kill her, I'll kill her!" Officer Budimlic, believing Smith would shoot ANDREA REBELLO and believing this might be his only opportunity, fired his weapon twice at Smith. After the first two shots, Officer Budimlic observed Smith let go of ANDREA REBELLO but still maintain the gun in his right hand. Officer Budimlic yelled to ANDREA REBELLO to get down. Officer Budimlic observed ANDREA REBELLO bend over and lean down toward the steps.

242. The version of the events as stated by the NCPD spokesman for this incident, LT. AZZATA, and BUDIMLIC's version as related by the District attorney's investigators, are completely inconsistent as to the motivation for shooting: one was in self defense, and the other in defense of Andrea.

243. Despite these inconsistent statements no further inquiry or investigation was conducted by the Defendants of this double homicide officer involved shooting.

244. Additionally, as previously stated herein, the autopsy findings are completely inconsistent with both of these statements attributed to BUDIMLIC, and the other Defendants, including GOLDMAN and FITZPATRICK were aware of the inconsistencies.

245. Defendants GOLDMAN and FITZPATRICK were pressured by the higher ranking Defendant supervisors, LT AZZATA and THOMAS DALE, to ignore the obvious inconsistencies and make sure the investigation was consistent with the Deadly Force Response Team's conclusion that the shooting was justified.

246. The Defendant investigators, when faced with the prospect of having to refute that the Deadly Force Response Team

came to a possibly erroneous conclusion that the shooting was justified, failed to follow up. The Defendants herein failed to conduct a full and thorough investigation of an officer involved shooting case, despite the inconsistent and therefore false statements by BUDIMLIC, who shot and killed two people.

247. The COUNTY has represented that it supplied Plaintiffs' attorneys in this action with the entire police file, including the crime scene records documents and notes, pursuant to a FOIL request, and subsequent litigation despite Plaintiffs disputing this claim. The COUNTY claims no records were left out.

248. Based upon what was turned over by the COUNTY, and the representations that it was a complete file of all records, the crime scene team - consisting of Defendants DET. PAUL PICH, DET MICHAEL MALONEY, DET BUFFALINO, and DET SERGENT AQUILINA, or any other police officer on behalf of the NCPD - did not take any field notes in investigating this incident, in a complete departure from good and accepted police practices.

249. Based upon what was turned over by the COUNTY and the representations that it was a complete file of all records, the crime scene team - consisting of Defendants DET. PAUL PICH, DET MICHAEL MALONEY, DET BUFFALINO, and DET SERGENT AQUILINA, or any other police officer on behalf of the NCPD - did not take any field notes in investigating this incident pursuant to the instructions of Defendant supervisors, including THOMAS DALE and

LT. AZZATA.

250. The crime scene team Defendants conducted no analysis as to the positions of BUDIMLIC, ANDREA REBELLO or Dalton Smith immediately before, during, or after the shooting.

251. No one from the COUNTY of Nassau conducted any analysis as to recreating the shooting. There was only one diagram which, indicated locations of blood collection and Smith's body in its final resting location (after RUSSO dragged him out the door and left him with his head hanging out the back door threshold), not where he was initially shot.

252. The defendant detectives from the crime scene investigation team, in addition to taking an insignificant amount of pictures, failed to take photographs of the entire area in which the shooting took place. The investigation was conducted in such a manner as to have the appearance of a complete and full investigation, but when the actual evidence is looked at there is no actual crime scene analysis, just measurements and collection of evidence and recording what was taken from the hostages and from the house.

253. By 3:15am the crime scene was secured all threats were determined to be eliminated and at that point ANDREA REBELLO and BUDIMLIC were both removed from the scene.

254. In a significant departure from good and accepted crime scene procedures for an officer involved shooting where two

57

people were killed, no photographs were taken until approximately 10:30 a.m. the next morning, with some of the photographs not being taken until closer to 12 pm the next day, almost 7 to 9 hours later, after the crime scene became stale. Proper crime scene procedures where there is a significant amount of blood and blood spatter would dictate that photographs be taken as soon as possible.

255. NCPD crime scene detectives on other cases had taken photographs at night, had flashes for their cameras, and had not waited until 7 to 10 hours later to take photographs.

256. The Defendant supervisors in charge of the crime scene ordered that photographs not to be taken by the crime scene detectives until 7 hours later.

257. Detective GOLDMAN and the other Defendant detective investigators proposed or inquired into numerous different types of analysis, and then abandoned them.

258. Detective GOLDMAN requested numerous different types of analysis based upon his notebook provided through FOIL disclosure, and then abandoned said investigation and analysis because THOMAS DALE, LT. AZZATA and other high ranking RICHARD ROE police commanders directed him to bury the investigation.

259. Detective GOLDMAN requested numerous different types of analysis based upon his notebook provided through FOIL disclosure, and then abandoned said investigation and analysis

58

because THOMAS DALE, LT. AZZATA and other high ranking RICHARD ROE police commanders directed him to abandon obtaining the full crime scene analysis because the shooting had already been determined to have been justified.

260. The records that were created by the Nassau County Police Department personnel and the Defendants herein were designed to be as sparse as possible and record as little information as possible.

261. Commissioner's Procedural Order, order no. 7-95, as well as good and accepted police procedures for hostage barricade incidents, give certain responsibilities for the officers as they arrive at the scene.

262. Commissioner's Procedural Order, Order no. 7-95 as well as good and accepted police procedures for hostage barricade incidents requires that the first police officers at the scene have certain responsibilities that do not include rushing into the house or building where hostages are being held.

263. The determination of exactly who was at the scene first is relevant to BUDIMLIC's and the other Defendants' conduct at the scene.

264. The attorneys for the Plaintiffs herein made a FOIL request for all GPS data for the vehicles that arrived at the scene, to determine in what order the vehicles arrived at the house, instead of having to rely upon the defendants herein for

that information.

265. The County provided GPS data for more than 30 vehicles that arrived at the scene, and almost all the vehicles GPS data that responded to the scene was available, except for BUDIMLIC's vehicle and those of a few of the other officers who arrived at the scene.

266. There has been no explanation provided by the County as to why the data was missing, and the fact that almost all data was available except for the BUDIMLIC's and a few other early responding officers can only be - like with the many other incidents of malfeasance by action or omission set forth above - because it was intentionally destroyed to further shield the Defendants, including BUDIMLIC, from liability and deny the Plaintiffs access to the courts.

## FIRST CLAIM

### DEPRIVATION OF RIGHTS UNDER THE
### UNITED STATES CONSTITUTION AND 42 U.S.C. §1983

267. The plaintiffs incorporate by reference the allegations set forth in all preceding paragraphs as if fully set forth herein.

268. By their conduct and actions in using unreasonable force upon, in exhibiting deliberate indifference to the life, health, welfare, medical needs, and safety of, in detaining,

seizing, falsely arresting and imprisoning, violating rights to
due process of, denying access to the courts of, engaging in
conduct that shocks the conscience upon, inflicting emotional
distress upon, and failing to intercede on behalf of, plaintiffs,
and in spoliating and fabricating evidence concerning the May 17,
2013 incident, the individual defendants, POLICE OFFICER NIKOLAS
BUDIMLIC, POLICE OFFICER NICHOLAS ZAHARIS, DETECTIVE MARTIN J.
HELMKE, JOHN DOE NASSAU COUNTY POLICE COMMUNICATIONS OFFICER
("PCO") WITH ID NUMBER 458, POLICE OFFICER JOSEPH AVANZATO,
POLICE OFFICER MICHAEL LEONE, POLICE OFFICER MARLON SANDERS,
POLICE OFFICER JOSEPH LOBELLO, POLICE OFFICER CHRISTOPHER
ACQUILINO, POLICE OFFICER RAYMOND BUTTACAVOLI, POLICE OFFICER
DANIEL HEALEY, POLICE OFFICER DENNIS WUNSCH, POLICE OFFICER
RONALD RUSSO, POLICE OFFICER D. STELLER, POLICE OFFICER THOMAS
CURTAIN, POLICE OFFICER JOHN TUCKER, POLICE SERGEANT ROBERT
COHEN, POLICE SERGEANT RICHARD HERMAN, POLICE OFFICER J.
SCHOEPFER, POLICE OFFICER E. JACOBSEN, POLICE OFFICER D.
MCGARRIGLE, THOMAS DALE, former  Commissioner of the Nassau
County Police Department, DETECTIVE FREDERICK GOLDMAN, DETECTIVE
FRANK A RUVULO, DETECTIVE JAMES HENDRY, DETECTIVE PAUL PICH,
DETECTIVE MICHAEL MALONEY, DETECTIVE BUFFALINO, DETECTIVE SERGENT
AQUILINA, LT. JOHN AZZATA, CHIEF LORRAINE A. HANNON, Chief Of
Support, DEPUTY INSPECTOR JOSEPH MAGRANE, Commanding Officer, 1st
Precinct, DEPUTY INSPECTOR DANIEL FLANAGAN, Commanding Officer,

61

Police Academy,

LIEUTENANT HARUN BEGIS, Commanding Officer, Firearms

Training Unit, DETECTIVE SERGEANT STEPHEN FITZPATRICK, Homicide

Squad, JOHN DOE POLICE OFFICERS 1-10, RICHARD ROE POLICE

SUPERVISORS 1-10, JOHN DOES, RICHARD ROES, and THOMAS DALE,

acting both on their own and in conspiracy with each other,

intentionally, maliciously, and with a deliberate indifference to

or a reckless disregard for the natural and probable consequences

of their acts, caused damage and injury in violation of the

plaintiffs' Constitutional rights as guaranteed under 42 U.S.C.

§1983 and the United States Constitution, including its Fourth

and Fourteenth Amendments.

269.    As a result of the foregoing, plaintiffs were

deprived of their life and liberty, suffered specific and serious

bodily injury, pain and suffering, loss of enjoyment of life,

loss of a family member, psychological and emotional injury,

great humiliation, costs and expenses, and were otherwise damaged

and injured.

**SECOND CLAIM**

**SUPERVISORY LIABILITY FOR DEPRIVATION OF RIGHTS UNDER THE
UNITED STATES CONSTITUTION AND 42 U.S.C. §1983**

270.  The plaintiffs incorporate by reference the

allegations set forth in all preceding paragraphs as if fully set

forth herein.

271. By failing to remedy the wrongs committed by their subordinates, and in failing to properly train, screen, supervise, or discipline their subordinates, supervisory individuals / officers Defendants LT JOHN AZZATA, POLICE SERGEANT ROBERT COHEN, POLICE SERGEANT RICHARD HERMAN, DETECTIVE SERGEANT AQUILINA, CHIEF LORRAINE A. HANNON, Chief Of Support, DEPUTY INSPECTOR JOSEPH MAGRANE, Commanding Officer, 1st Precinct, DEPUTY INSPECTOR DANIEL FLANAGAN, Commanding Officer, Police Academy, LIEUTENANT HARUN BEGIS, Commanding Officer, Firearms Training Unit, DETECTIVE SERGEANT STEPHEN FITZPATRICK, Homicide Squad, Former Commissioner THOMAS DALE, RICHARD ROES 1-10 and RICHARD ROES, caused damage and injury in violation of plaintiff's rights guaranteed under 42 U.S.C. §1983, and the United States Constitution, including its Fourth and Fourteenth amendments.

272. As a result of the foregoing, plaintiffs were deprived of their life and liberty, suffered specific and serious bodily injury, pain and suffering, loss of enjoyment of life, loss of a family member, psychological and emotional injury, great humiliation, costs and expenses, and were otherwise damaged and injured.

## THIRD CLAIM

## LIABILITY OF THE COUNTY OF NASSAU
## FOR CONSTITUTIONAL VIOLATIONS

273.  The plaintiffs incorporate by reference the
allegations set forth in all preceding paragraphs as if fully set
forth herein.

274.  At all times material to this complaint, defendant THE
COUNTY OF NASSAU, acting through its police department, and
through the individual defendants had de facto policies,
practices, customs and usages which were a direct and proximate
cause of the unconstitutional conduct alleged herein.

275.  At all times material to this complaint, defendant THE
COUNTY OF NASSAU, acting through its police department, and
through the individual defendants, had de facto policies,
practices, customs, and usages of failing to properly train,
screen, supervise, or discipline employees and police officers,
and of failing to inform the individual defendants' supervisors
of their need to train, screen, supervise or discipline said
defendants.  These policies, practices, customs, and usages were
a direct and proximate cause of the unconstitutional conduct
alleged herein.

276. At all times material to this complaint, the defendant
THE COUNTY OF NASSAU, acting through its police department and
through the individual defendants, had de facto policies,

practices, customs and/or usages of unnecessarily provoking, and / or unnecessarily resorting to deadly force when dealing with hostage-takers, and of not having and / or using personnel specially trained in dealing with hostage scenarios when hostage scenarios arose. Such policies, practices, customs and/or usages are a direct and proximate cause of the unconstitutional conduct alleged herein.

277. At all times material to this complaint, the defendant THE COUNTY OF NASSAU, acting through its police department and through the individual defendants, had de facto policies, practices, customs and/or usages of failing to properly train police officers, 911 operators, and their supervisors, both generally and specifically with regard to hostage scenarios. Such policies, practices, customs and/or usages are a direct and proximate cause of the unconstitutional conduct alleged herein.

278. At all times material to this complaint, the defendant THE COUNTY OF NASSAU, acting through its police department and through the individual defendants, had de facto policies, practices, customs and/or usages of failing to properly train its officers in the use and discharge of firearms, both generally and specifically in the context of hostage scenarios and/or in scenarios where innocent civilians are known to be present in the immediate area toward which guns are pointed and bullets discharged, and failed to properly investigate incidents of

police shootings and/or screen officers – such as Defendant BUDIMLIC – who have discharged their firearms on multiple occasions.  Such policies, practices, customs and/or usages are a direct and proximate cause of the unconstitutional conduct alleged herein.

279. At all times material to this complaint, the defendant THE COUNTY OF NASSAU, acting through its police department and through the individual defendants, had de facto policies, practices, customs and/or usages of encouraging and/or tacitly sanctioning the cover-up of other law enforcement officers' misconduct, through, *inter alia*, in having deficient policies and / or policies missing from their department manual, through the fabrication of false accounts and evidence and/or through the spoliation of evidence and/or through conducting perfunctory, sham, whitewash investigations, particularly in the context of officer involved shootings, and/or through "the blue wall of silence." Such policies, practices, customs and/or usages are a direct and proximate cause of the unconstitutional conduct alleged herein.  *See*, e.g., http://data.newsday.com/crime/nassau-police/ :

> The [Nassau County Police] department confirmed Newsday's findings in acknowledging that since at least 2006 — as the number of officers shooting suspects rose sharply — Nassau's deadly force investigators have never found that their officers were wrong when they felt the need to seriously injure or kill someone. Though the department spokesman, Insp. Kenneth Lack, said many uses of police deadly force are subject to an

additional, more thorough investigation by Nassau's homicide squad, he confirmed that those detectives also had not found a use of deadly force unjustified.

280. As a matter of COUNTY policies and practices, the individual Defendants herein failed to properly investigate this officer involved shooting, failed to properly investigate and document the crime scene, failed to preserve evidence, spoliated evidence, fabricated evidence, failed to follow the most basic tenets of crime scene integrity, failed to take the most basic steps in any investigation of an officer involved shooting crime scene investigation, pressured supervisors and investigators into only conducting a cursory investigation so as not to come to any conclusion that would contradict the deadly force response team's findings that this was a justified shooting, failed to do proper crime scene investigation in order to shield the Defendants from liability and deny the Plaintiffs fair access to the courts with material evidence that normally would have been collected, gathered, preserved and recorded in an officer involved shooting where an innocent hostage was killed, in order to attempt to prevent the Plaintiffs from proving and establishing all the elements necessary to establish a constitutional violation by defendants herein.

281. Defendant THE COUNTY OF NASSAU authorized and tolerated as institutionalized practices, and ratified the misconduct detailed above, by failing to take adequate precautions in the supervision and/or training of police personnel, including the individual

defendants herein.

282. The defendant COUNTY OF NASSAU's policies/customs and failure to supervise and/or train its employees, including the individual defendants herein rose to the level of deliberate indifference to the consequences of its actions, and indifference to plaintiffs' rights, privileges and immunities secured by the Constitution of the United States of America, _inter_ _alia_, plaintiffs' Fourth and Fourteenth Amendment rights.

283. As a result of the foregoing, plaintiffs were deprived of their life and liberty, suffered specific and serious bodily injury, pain and suffering, loss of enjoyment of life, loss of a family member, psychological and emotional injury, great humiliation, costs and expenses, and were otherwise damaged and injured.

WHEREFORE, the plaintiffs demand the following relief jointly and severally against all of the defendants:

     a.   Compensatory damages;

     b.   Punitive damages;

     c.   The convening and empanelling of a jury to consider the merits of the claims herein;

     d.   Costs and interest and attorney's fees;

     e.   Such other and further relief as this court may deem appropriate and equitable.


Dated:    New York, New York
           May 16, 2016


ROTH & ROTH, LLP

By: David A. Roth
Co-Counsel for Plaintiffs
192 Lexington Ave., Ste. 802
New York, NY 10016
(212) 425-1020
droth@rothandrothlaw.com

LAW OFFICE OF BYRON LASSIN

By: Byron Lassin
Co-Counsel for Plaintiffs
75-15 Broadway, 2nd Fl.
Elmhurst, NY 11373
(718) 651-0500
Lassinoffice@aol.com